**JEFFREY MFG. CO. v. ANDREWS.**
No. 6428.

Circuit Court of Appeals, Seventh Circuit.
March 31, 1938.

George H. Grear, Hayes McKinney, and Jeffrey Shedd, all of Chicago, Ill., for appellant.

Maurice E. Gosnell and Noah M. Tohill, both of Lawrenceville, Ill., and Walter T. Gunn and Harold F. Lindley, both of Danville, Ill., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from an order entered by the District Court sustaining a motion to dismiss a complaint and rendering judgment in bar. The question presented, therefore, is whether or not the bill of complaint stated a good and sufficient cause of action.

Appellant states that its action was for damages for breach of a written undertaking by which appellee agreed, upon the occurrence of a specified contingency, to assume and pay an indebtedness owing it from a third party.

The bill of complaint set out that in January, 1935, the Kix Miller Coal Company sought to purchase from appellant two coal loaders for use in a mine operated by it under a contract, a copy of which was attached, and the pertinent provisions of

352

which we set forth in the margin;[1] that appellant refused to sell the machinery unless and until appellee undertook to assume payment of any balance of the purchase price remaining unpaid in the event appellee became obligated to take over and operate the mine in order to carry out the terms and conditions of the contract, whereupon an agreement to that effect was written and signed by appellee and delivered to

[1] This Agreement, made and entered into this 15th day of December, 1934, by and between Tyler L. Andrews, as Trustee, * * * hereinafter designated First Party; Fred Kix Miller and Edward F. Kix Miller, * * * partners doing business under the name and style of Kix Miller Coal Mining Company, hereinafter designated as Second Parties; and Allied Coal and Mining Company, an Illinois corporation, * * * hereinafter designated as Third Party,

Witnesseth: That

Whereas the First Party is the owner of a certain Coal Mine * * * and

Whereas the Second Parties are engaged in the active operation of said Mine by contract with and on behalf of the First Party; and

Whereas the Third Party is engaged in the business of buying and selling coal at wholesale; and

Whereas both the First and Second Parties are desirous of inducing the Third Party to purchase the entire output of said Mine for a period of years and the Third Party is willing to purchase the same upon certain terms and conditions hereinafter set forth; and

Whereas a branch of the Southern Railway Company connects said Mine with other Railroads and it is necessary for the Second Parties to transport the coal produced at said Mine over the same; and

Whereas said Southern Railway Company requires a guaranty fund of $5,000.-00 to be deposited with it, to secure the payment of a minimum annual income from the First and Second Parties on account of freight rates and service charges of said Southern Railway Company to be rendered in connection with the operation of said Mine; and

Whereas the First and Second Parties desire that the Third Party shall furnish the necessary money or securities to provide such guaranty fund to said Southern Railway Company;

Now, Therefore, * * *

1. The First Party hereby guarantees and agrees, as a part of the consideration for this contract running to the Third Party and as an inducement to the Third Party to enter into this contract, that the Second Parties shall and will, at all times during the life of this contract, abide by and faithfully perform and fulfill, * * * all of the terms, covenants and conditions therein provided to be performed and fulfilled by the Second Parties:

2. The Second Parties agree that * * * they will produce from said Mine all of the marketable coal * * * provided, however, that the average daily production of coal shall not at any time be less than 500 tons after January 15, 1935, * * * except as the Second Parties may be prevented from producing such minimum amount of coal by strikes, lockouts or other causes * * * and/or by the further agreement of the parties; and the Second Parties further agree to sell all of such coal so produced to the Third Party and to no other person, firm or corporation * * *

3. Relates to the sale and delivery of "wagon-coal."

4. The Third Party agrees to purchase of the Second Parties all of the coal produced by the Second Parties at said Mine, shipments, sales and payments to be made on the following bases:

(a) The prices to be paid for such coal shall be the current lawful market prices at time of shipment less 12% thereof;

(b) The coal * * * shall be shipped by the Second Parties only as, when and to whom directed by the Third Party, except as the so-called, "wagon-coal" sold and delivered at the Mine;

(c) Provides for time of payment by Third Party to Second Parties.

(d) In the event a purchaser of coal (other than Third Party) should claim a deduction from the purchase price asserted to be due to improper preparation thereof, such deduction, if made, shall be chargeable to and payable by the First and Second Parties, and the Third Party shall have the right to deduct the amount allowed therefor from the next ensuing current payment due from the Third Party to the Second Parties.

5. The Third Party agrees to deposit, for and on behalf of the Second Parties, with the Southern Railway Company, on its demand, the sum of $5,000.00, * * * to secure payment by the First and Second Parties of a minimum annual income of said Railway Company of the sum of $5,000.00 on account of freight charges and other charges for service rendered by said Railway Company in connection with the operation of said Mine; provided, however, that, in the event of a deficiency becoming due to the Southern Railway Company on such account, the First and Second Parties agree to

appellant;[2] that in reliance upon this agreement appellant sold and delivered to the Kix Miller Company two coal loaders for an aggregate price of $11,600; that early in 1935 the Company began to operate the mine pursuant to the contract, and operated it until November, 1935, when it became insolvent and ceased to operate it; that when it ceased to operate the mine, without reasonable prospect that such operation could be resumed, it became the duty of appellee to take over and operate the mine according to the provisions of the contract, and at the same time, it became his duty to assume payment of the unpaid balance due appellant on the loaders, in the amount of $9,280, in which amount appellant demanded judgment.

Appellant contends that the first contract, to which it was not a party, was one of suretyship by the terms of which appellee was jointly bound with his principal to its full and complete performance, and that when the principal ceased to perform, and it became clear that it would be unable to resume performance, that failure of performance created a legal obligation on the part of appellee to perform by taking over the operation of the mine. His brief and argument, therefore, are largely devoted to a discussion of the principles of suretyship and an attempt to prove that the contract of December, 1934, contains all the elements necessary to create a suretyship relationship between appellee and the other parties to it. Its contention apparently is that the only thing it needs to prove in order to fix appellee's liability, is that that contract was one of suretyship. While we are not convinced that that result follows from the agreement of January 1935, we are convinced that the agreement of December 1934, cannot be construed as one of suretyship rendering it necessary for appellee to take over the operation of the mine.

The first paragraph of the contract

---

promptly pay the same, and, if not paid, then the Third Party shall have the right to pay the same and deduct the amount thereof from any amounts which, at such time, may be due from the Third Party to the First and Second Parties, or either of them;

6. It is further agreed between the parties that neither the First nor the Second Parties shall have any interest whatsoever in any of the proceeds of any sales made by the Third Party of coal purchased by the Third Party from the First and Second Parties;

7. The Second Parties guarantee and agree that all coal sold to * * * the Third Party shall at all times be of such quality and preparation * * * as may be required by the Third Party, and the First and Second Parties shall at all times maintain said Mine and the machinery and equipment used in connection therewith in such condition as to accomplish this purpose;

8. The Second Parties further agree that the machinery and equipment of said Mine shall at all times be kept and maintained in such condition as to enable them to prepare for sale to the Third Party coal which, at all times, shall be suitable for sale in competitive markets for like coal;

9. It is further agreed between the parties that, in the event of the failure of the Second Parties to operate said Mine, without any reasonable prospect of resuming such operation, then, in the event the First Party shall not take over and operate the Mine, under the terms and conditions of this contract, the Third Party shall have the unhampered right either to enter upon the premises and itself to operate the Mine or to designate a person, firm or corporation who shall operate the Mine, and such operation, when such person, firm or corporation shall be named and shall take over the operation of the Mine, shall then operate under the terms and conditions of this contract; and, in such event, the then operator of such Mine shall also be bound and shall benefit by all of the terms and conditions of any contract then existing between the First Party, as the owner of the said Mine, and the Second Parties;

10. Provides for readjustment of prices if new federal or state taxes imposed.

11. Provides contract to continue for five years, and termination by limitation of time not to operate as release of any unfulfilled obligations on the part of either party existing at time of termination.

2 "Jeffrey Mfg. Co.
"Chicago, Ill.
"Gentlemen:
"In case it becomes necessary for me to take over and operate Francisco Mine No. 2 at Francisco, Ind. in order to carry out the terms and conditions of a certain contract between myself, as Trustee, KixMiller Coal Company, and the Allied Coal and Mining Company of Chicago, Illinois, I will then be willing to assume any payment then due on two Jeffrey Loading Machines ordered from you for operation in said mine.
"Yours very truly,
"T. L. Andrews."

clearly makes appellee a guarantor rather than a surety, "The First Party guarantees and agrees * * * that the Second Parties shall and will * * * faithfully perform * * * all the terms * * * to be performed and fulfilled by the Second Parties." It is to be noted that appellee did not by this paragraph guarantee the performance of the contract, or that it would be performed, but rather, that the second parties would perform it. Appellee did not in it assume any primary liability for performance. Appellant contends, however, that the trial court was unduly impressed with this provision of the contract, and should have given more weight to other provisions which, it claims, manifest a different general intention. It calls our attention, for instance, to paragraph 4(d) which provides that deductions made by purchasers of coal on account of improper preparation shall be chargeable to and payable by the first and second parties; to paragraph 5 which relates to a deposit by the third party to secure payment by the first and second parties, and provides that in case of a deficiency, the first and second parties agree to pay it promptly, and if not paid, the third party may pay it and deduct it from the amount due from it to the first and second parties; to paragraph 6 relating to sales of coal from the first and second parties to the third; and paragraph 7 which requires the first and second parties to maintain the mine and equipment in condition, and provides for the appointment of arbitrators, one to be chosen by the third party and a second to be appointed by the first and second parties. Appellant also calls attention to paragraph 9 which provides that if the second parties fail to operate the mine, and the first party does not take it over and operate it, the third party may enter and operate it itself, or choose another person or corporation to do so. All of these provisions, appellant argues, manifest an intention on the part of the parties that the first shall be equally bound with the second for the operation of the mine. We do not so construe the contract. We find nothing in the provisions referred to imposing upon appellee any obligation to operate the mine. True, he

might be charged with payments due under the contract and which the income from the operation of the mine was insufficient to cover, but that is not to say that he was charged with responsibility for operating the mine.

A case cited by appellant and described by it as a leading case in defining the fundamental nature of a surety's obligation, Reigart v. White, 52 Pa. 438, is an excellent illustration of language sufficient to create a suretyship obligation, and it also clearly shows the distinction between such language and that relied upon by appellant here. In that case, the court held that a party who wrote a letter to a vendor at some time after he had agreed to sell goods to be paid for in nails, stating, "I will be responsible for the delivery of the nails as agreed by Mr. Emory," thereby made herself a surety for the delivery of the nails. Her undertaking was very different from a guarantee that Emory would deliver the nails. Here, had appellee said he would be responsible for performance of the contract, or operation of the mine, no doubt his obligation would have been that of a surety. However, that was not his promise. Instead, he undertook, simply, that the second parties would fulfill the terms and conditions of the contract. We think it requires no citation of authorities to show that the language used created a secondary and indirect obligation rather than a primary and direct one. While the various provisions to which reference is had do indicate that the parties may have contemplated that the first party might take over the operation of the mine, certainly there is no provision by which he could be compelled to do so. Hence, we agree with the District Court in its statement that the facts pleaded do not show that it ever became necessary for him to take over and operate the mine or that he ever became legally liable to do so. It follows that the contingency relied upon by appellant to render appellee liable on his undertaking of January 1935, is not shown to have materialized, hence appellant's bill of complaint did not state a cause of action, and it was, therefore, properly dismissed.

Judgment affirmed.